United States District Court
Southern District of Texas
**ENTERED**
July 06, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| CARLOS GUADALUPE CANTU, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:20-CV-0167 |
| | § | |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION

Petitioner CARLOS GUADALUPE CANTU, a state prisoner proceeding pro se, initiated this action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Dkt. No. 1). Petitioner is serving sentences of life imprisonment and 99 years' imprisonment following respective convictions by jury of capital murder and attempted capital murder in the 389th District Court of Hidalgo County, Texas. These convictions were affirmed on direct appeal to the Thirteenth Court of Appeals of Texas (the "Appeals Court") and on state collateral review by the Texas Court of Criminal Appeals (the "TCCA"). Now, seeking federal habeas review, Petitioner raises several claims for relief from the convictions, including claims of governmental misconduct, prosecutorial misconduct, double jeopardy, an unconstitutional identification procedure, unconstitutional pre-trial delay, multiple claims of ineffective assistance of counsel at trial and on appeal, and insufficient evidence to support the conviction. (*Id.* at 7-16).

Respondent has since made an appearance and filed a Motion for Summary Judgment (the "Summary Judgment Motion") (Dkt. No. 8) together with an electronic copy of the state court

record (Dkt. No. 9).[1] Respondent seeks the dismissal of the Petition on the grounds that Petitioner's claims are either not cognizable on federal habeas review or are otherwise without merit. (Dkt. No. 8 at 11-43). Petitioner has submitted a response in opposition. (Dkt. No. 10).

This case was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the record and relevant law, the undersigned respectfully RECOMMENDS that the Summary Judgment Motion (Dkt. No. 8) be GRANTED, that the Petition (Dkt. No. 1) be DENIED, and that this civil action be DISMISSED. The undersigned also RECOMMENDS that a Certificate of Appealability be DENIED.

## I. BACKGROUND

### A. Offense Conduct and Investigation

Between the late hours of January 24, 2002 and the early hours of January 25, 2002, several men broke into the home of Juan and Soledad Viacobo in Donna, Texas (the "Viacobo Residence"). *Cantu v. State*, 2006 WL 3953398, at *1 (Tex. App.—Corpus Christi Dec. 21, 2006, pet. ref'd) (mem. op.). At the time, five of the Viacobos' eight children resided with them, including their sons Carlos and Julio. *Id.* Upon breaking into the Viacobo Residence, the intruders began firing their weapons and claiming to be the police. *Id.* The incident resulted in several of the Viacobos, including Julio, being injured either by gunshot wounds or by physical assault, and with the death of Carlos. *Id.* at *1, 5-6. Ruben Villarreal ("Villarreal"), one of the intruders, also received a gunshot wound. *Id.* at *1.

One of the lead investigators of the incident was Officer Pablo Silva ("Officer Silva"), who was then-employed as a deputy sheriff and criminal investigator with the Hidalgo County Sheriff's Department. (Dkt. No. 9-23 at 14-15). On the morning after the incident, Officer Silva went to a

---

[1] Any citations to the state court record will refer to the docket entry, attachment, and page numbers as appearing in this court's case management/electronic case-file (CM/ECF) system.

hospital in Mission, Texas, where Villarreal was being treated for his gunshot, and took Villarreal's written statement. (*Id.* at 17-18; Dkt. No. 9-27 at 53-54). In the written statement, Villarreal provided the names of the other intruders, including that of "'El Pio' (Carlos)." (Dkt. No. 9-31 at 294). Officer Silva then went to McAllen Medical Center, where he took statements from the Viacobo family. (Dkt. No. 9-23 at 17-18, 21). Based on this investigation, along with further investigations carried out by other officials, Petitioner was identified as a suspect. (*Id.* at 19).

On January 30, 2002, an arrest warrant for capital murder was issued for Petitioner. (Dkt. No. 9-19 at 31-32).

Around three weeks after the incident, Officer Silva met with Jaime Viacobo, one of the Viacobo children, and his wife, Mariana Martinez ("Martinez") (Dkt. No. 9-26 at 33), both of whom lived in a travel trailer next to the Viacobo Residence and witnessed the break-in (*id.* at 38). Jaime and Martinez each identified Petitioner as one of the intruders. (*Id.* at 35).

On September 5, 2003, Petitioner was arrested on the arrest warrant for capital murder during a traffic stop. (Dkt. No. 9-27 at 42).

## B. The Trial and Witness Testimony

On October 29, 2003, Petitioner was charged by indictment with one count of capital murder and one count of attempted capital murder. (Dkt. No. 9-19 at 8-9). His trial began on July 13, 2004. (Dkt. No. 9-20 at 318). The State called the following pertinent witnesses: Villarreal; Jaime Viacobo; Martinez; Officer Silva; an Investigator Ricardo Arredondo ("Investigator Arredondo"), who conducted Petitioner's arrest; and two forensic analysts with the Texas Department of Public Safety Crime Laboratory (the "TDPS Crime Laboratory"). Generally, through cross-examination, the defense tried to raise a reasonable doubt as to Petitioner's identity as one of the intruders at the Viacobo Residence.

1.  Villarreal

Villarreal testified that on January 24, 2002 he and Petitioner were invited to travel with several individuals in a pickup truck to Donna. (Dkt. No. 9-27 at 45). He further testified that he did not initially know the purpose of the trip. (*Id.*). Villarreal, Petitioner, and the others eventually arrived at the Viacobo Residence where they were met by two other individuals. (*Id.*). Villarreal stated that he was armed and that each of the other men, excepting Petitioner, was also armed. (*Id.*). Villarreal testified that he entered the Viacobo Residence and was subsequently shot with his own weapon. (*Id.* at 46). He eventually made it back to the truck but did not know how he did so. (*Id.*). Defense counsel cross-examined Villarreal concerning the written statement he gave to Officer Silva. (*Id.* at 53). Through the written statement, Villarreal indicated that he knew the purpose of the trip was to commit a robbery and that he was shot while "getting off" the truck, not while he was inside the Viacobo Residence. (*See id.* at 53-54).

2.  Jaime Viacobo

Jaime Viacobo testified that he was awoken on the morning of the incident by Martinez, who told him that several men had pulled up to the Viacobo Residence in a pickup truck. (Dkt. No. 9-26 at 39). Jaime stated that he saw a man, later identified as Villarreal, carrying a rifle. (*Id.*). Arming himself with two knives from his kitchen, Jaime then entered the Viacobo Residence. (*Id.*). Once inside, he saw a man with a light complexion who was wearing a blue-and-white flannel jacket and holding a gun. (*Id.* at 40). Jaime identified the man as Petitioner. (*Id*). According to Jaime, "he was able to see [Petitioner] even though it was dark in the house because his mom had three candles lit on the stove and the light from two light poles outside shed light inside the house." *Cantu*, 2006 WL 3953398, at *5. Jaime testified that "he recognized [Petitioner] because he saw his face and because of [Petitioner's] jacket and light skin color." *Id.*

### 3. Martinez

Martinez testified to observing the intruders standing outside of the pickup truck before entering the Viacobo Residence. (Dkt. No. 9-27 at 28). According to Martinez, she was able to see Petitioner's face with light coming from a nearby lamp pole. *Cantu*, 2006 WL 3953398, at *5. Martinez testified that three of the men, including Petitioner, waited at the pickup truck for a few moments before Petitioner ran to a nearby carport and the two other men ran toward the Viacobo Residence's patio. (Dkt. No. 9-27 at 27-28). Martinez stated that she saw Petitioner a second time when he exited the Viacobo Residence holding a rifle. (*Id.* at 40).

### 4. Officer Silva

Officer Silva testified about his initial investigation (Dkt. No. 9-23 at 17), as well as a pre-trial identification procedure with Jaime Viacobo and Martinez, *Cantu*, 2006 WL 3953398, at *6. Officer Silva separately showed Jaime and Martinez a photo array. (Dkt. No. 9-26 at 33). The array consisted of several photographs of different Hispanic males of similar size-and-build and with similar facial hair and hair color, including one photo of Petitioner. (*Id.* at 35). Officer Silva obtained Petitioner's photo through a database administered by the FBI's Violent Crimes Task Force. (Dkt. No. 9-23 at 19). According to Officer Silva, both Jaime and Martinez identified Petitioner in the array. (Dkt. No. 9-26 at 35). Officer Silva testified that he believed Jaime and Martinez were informed that warrants were issued for some suspects in the case prior to identifying Petitioner. (*Id.* at 35-36). Jaime and Martinez each testified, however, that no one suggested to them that Petitioner's photo was of one of the suspects. (*Id.* at 44; Dkt. No. 9-27 at 34). Both also testified that they were confident in their identification. (Dkt. No. 9-26 at 45; Dkt. No. 9-27 at 34).

5.  Investigator Arredondo

Investigator Arredondo testified that he arrested Petitioner pursuant to the arrest warrant for capital murder during a traffic stop on September 5, 2003.  (Dkt. No. 9-27 at 42).  Petitioner initially identified himself to Investigator Arredondo as "Juan Martin Lopez" but eventually admitted that he was known socially as "El Pio," a nickname associated with Petitioner.  (*Id.* at 42-43).  Investigator Arredondo was familiar with Petitioner's nickname and his appearance because he was involved in the investigation and had seen photographs of Petitioner.  (*Id.* at 43).

6.  Forensic Analysts

Monica Garza, a DNA analyst with the TDPS, testified that she analyzed ten different objects obtained from the crime scene.  (Dkt. No. 9-24 at 16).  None of the DNA obtained from the objects matched Petitioner's DNA profile.  (*Id.* at 17).  Robert Ivan Wilson, also with the TDPS Crime Laboratory, testified that he analyzed hair samples from various articles of clothing recovered from the crime scene.  (Dkt. No. 9-27 at 11-12).  According to his testimony, "there were no characteristics that were similar between the hairs that were recovered and the known head hair of [Petitioner]."  (*Id.* at 13).

**C.  Conviction and Sentencing**

On July 23, 2004, after an eight-day trial, Petitioner was convicted on both counts of the indictment.  (Dkt. No. 9-20 at 285-304).  He was later sentenced to life imprisonment for capital murder and 99 years for attempted capital murder.  (*Id.* at 318-23).

**D.  State Appeal and Post-Conviction Review**

Petitioner sought a direct appeal, but the Appeals Court affirmed his conviction.  *Cantu*, 2006 WL 3953398, at *11.  Next, Petitioner sought but was denied discretionary review in the

TCCA. (Dkt. No. 9-9 at 1). Petitioner then filed a petition for writ of certiorari with the Supreme

Court of the United States, which denied the petition on February 19, 2008. (Dkt. No. 9-12).

On or about December 15, 2008, Petitioner filed a state application for writ of habeas

corpus with the TCCA. (*See* Dkt. No 9-40 at 23). The TCCA, without a written order, denied

Petitioner's requested relief on June 17, 2009.[2] (*Id.* at 2).

## E.  Federal Habeas Proceedings

The Petition was filed on August 12, 2009.[3] Due to a docketing-related oversight, however,

this case lay dormant until June 2020, when the Petition was referred to the undersigned and

Respondent was ordered to respond. (Dkt. No. 2). On December 4, 2020, Respondent filed the

Summary Judgment Motion.[4] (Dkt. No. 8). Petitioner then filed his response. (Dkt. No. 10).

## II.  GROUNDS FOR RELIEF

Petitioner raises what the undersigned construes as ten classes of claims for relief.

---

[2] On or about May 27, 2009, while his first state habeas petition was still pending, Petitioner filed another
state application for writ of habeas corpus (*see* Dkt. No. 9-40 at 3), which was denied on November 5, 2014
because Texas law prohibits the filing of subsequent habeas petitions (*see* Dkt. No. 9-41).

[3] This is the date on which Petitioner claims to have placed the Petition in the prison mailing system. (Dkt.
No. 1 at 17). Filings by pro se prisoners are governed by the mailbox rule, such that they are deemed filed
when they are deposited for mailing. *Medley v. Thaler*, 660 F.3d 833, 835 (5th Cir. 2011) (per curiam).

[4] In the Summary Judgment Motion, Respondent noted that the Petition was not filed and docketed until
October 6, 2009 and argued that, if the Petition was placed in the prison mailing system on this date instead
of on August 12, 2009, the Petition would be untimely. (Dkt. No. 8 at 6-8). Respondent indicated that they
were attempting to locate the prison mail logs to determine precisely when the Petition was placed in the
prison mailing system. (*Id.* at 6). On January 29, 2021, Respondent filed an advisory stating that "the
requested mail logs, from 2009, [were] outside the Texas Department of Criminal Justice . . . retention
policy and, in this case, unavailable." (Dkt. No. 11 at 1-2). The undersigned interprets this to mean that
Respondent has abandoned any challenge as to the timeliness of the Petition. Other than the abandoned
limitations issue, Respondent does not raise any procedural errors associated with the filing of the Petition
and expresses the belief that Petitioner has exhausted all state remedies regarding his claims. (Dkt. No. 8
at 5).

First, Petitioner complains of "outrageous government misconduct" insofar as (1) his conviction was supported by an illegal indictment and (2) his arraignment was conducted in the presence of the grand jury. (Dkt. No. 1 at 7, 9).

Second, Petitioner contends that his conviction resulted from prosecutorial misconduct considering that he was held "for 326 days with no bond on an invalid arrest warrant that was not for the [c]apital murder [charge] as alleged by the state prosecutor." (*Id.* at 7, 10).

Third, Petitioner claims that his convictions for capital murder and attempted capital murder constituted double jeopardy. (*Id.* at 7).

Fourth, Petitioner claims that the identifications made by Jaime Viacobo and Martinez through the photo array were unconstitutional because the witnesses were each made aware that an arrest warrant for Petitioner had issued prior to the identifications. (*Id.* at 7, 11).

Fifth, Petitioner raises unconstitutional pre-trial delay, alleging that he "spent 326 days in the Hidalgo County jail . . . pending jury trial for [c]apital murder." (*Id.* at 8, 12).

Sixth, Petitioner claims that he received ineffective assistance of counsel at trial, complaining that counsel (1) failed to object to the arrest warrant, Petitioner's arraignment in the presence of the grand jury, and the jury charge, (2) failed to "plead double jeopardy," and (3) filed a notice of appeal only as to one count of conviction. (*Id.* at 13).

Seventh, Petitioner claims that he received ineffective assistance of counsel on appeal insofar as counsel (1) filed multiple motions requesting extensions to file an appellate brief and (2) failed to raise claims as to the ineffective assistance of trial counsel. (*Id.* at 14).

Eighth, Petitioner contends that insufficient evidence was presented at trial to support his conviction. (*Id.* at 15).

Ninth, Petitioner complains that he "was indigent and was denied access to a free transcript of [his] trial record for the appeal." (*Id.* at 16).

Tenth, through his response to the Summary Judgment Motion, Petitioner can arguably be understood to request that the District Court enter a nunc pro tunc correction of his sentence, which he claims is a 35-year term of imprisonment. (*See* Dkt. No. 10 at 2-3).

### III. LEGAL STANDARDS

#### A. Collateral Review Under § 2254

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996, federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides in pertinent part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to a Supreme Court decision on a question of law or if it arrives at a different result than the Supreme Court did on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs where "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. The standard is "objectively unreasonable." *Id.* Indeed, "a federal habeas court may not issue the

writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

This deferential standard applies even where, as here, the TCCA has denied habeas relief without written order. *Santellan v. Cockrell*, 271 F.3d 190, 193-94 (5th Cir. 2001). There is no requirement that a state court write an opinion explaining its reasoning. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "For such a situation, [the federal habeas court]: (1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application of' that law." *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003). Otherwise, a federal habeas court will look to the last reasoned state court opinion. *See Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. Insofar as the interpretation of state law is concerned, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[,]" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Any factual findings by the state court are entitled to a presumption of correctness, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

A pro se petitioner's pleadings are construed liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam). At the same time, to raise a constitutional issue, they must plead sufficient facts beyond conclusory allegations. *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018).

## B. Ineffective Assistance of Counsel

An ineffective-assistance-of-counsel claim is analyzed according to the Supreme Court's two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. Thus, under *Strickland*, the petitioner must show that counsel's performance was both (i) deficient and (ii) prejudicial.

Counsel's performance is deficient where it falls below an objective standard of reasonableness. *Id.* at 688. In reviewing this *Strickland* factor, "every effort [is] made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Counsel will be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A court will not second-guess strategic decisions or fault the attorney for deviations from best practices. *Premo v. Moore*, 562 U.S. 115, 122 (2011). Rather, the court looks to whether the attorney was incompetent under "prevailing professional norms." *Id.* Moreover, the reasonableness of counsel's conduct must be viewed as of the time of that conduct, *Maryland v. Kulbicki*, 577 U.S. 1, 4 (2015) (per curiam), such that it is based on the law

in place when the potential error occurred, *United States v. Webster*, 392 F.3d 787, 796 (5th Cir. 2004). There is no duty of counsel to anticipate changes in the law. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009).

To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* This showing is specific to the stage of the proceedings in which the deficient performance is alleged to have occurred.

On appeal, where the ineffective assistance is based on counsel's failure to raise an issue, the petitioner must show "that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue[,]" and then "that the attorney's deficient performance led to a fundamentally unfair and unreliable result." *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001).

The burden of proof to establish ineffective assistance is upon the petitioner, who must do so by a preponderance of the evidence. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). The failure to raise a meritless argument is an insufficient basis for ineffective assistance because the result of the proceeding would not have been different had the issue been raised. *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Also, mere conclusory allegations of ineffective assistance do not raise a constitutional issue. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).

If the petitioner fails to prove one *Strickland* prong, the other prong need not be considered; nor must the prongs be analyzed in any particular order. *Strickland*, 466 U.S. at 697.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly

deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105

(internal quotations and citations omitted). In such a case, "the test is whether the state court's

decision . . . was contrary to, or an unreasonable application of, . . . clearly established federal law

. . . ." *Schaetzle*, 343 F.3d at 444.

## IV.  ANALYSIS

Each of Petitioner's ten classes of claims will be discussed in turn.

### A.  State Procedural Defects

Petitioner claims that his conviction was the result of "government misconduct." (Dkt.

No. 1 at 7). Specifically, Petitioner contends that (1) his conviction was supported by an illegal

indictment and (2) his arraignment was conducted in front of the grand jury. (*Id.* at 9). Instead of

the vague category of "government misconduct," the undersigned understands these claims to be

based on alleged state procedural defects, each of which will be addressed in turn.

#### 1.  Illegal indictment

Petitioner alleges that his indictment was "illegal" or otherwise faulty because it failed to

allege any party liability. (Dkt. No. 1 at 7, 19). Insofar as Petitioner's claim is based on alleged

substantive defects contained in his indictment, the claim is non-cognizable. "The sufficiency of

a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment

is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68

(5th Cir. 1994). The Texas Constitution provides that "presentment of an indictment . . . to a court

invests the court with jurisdiction of the cause." TEX. CONST. art. V, § 12(b); *McKay*, 12 F.3d at

69. Indeed, "Texas courts have held . . . that failure to include an essential element of the crime

charged, which constitutes a defect of substance, does not deprive the trial court of jurisdiction."

*McKay*, 12 F.3d at 69 (citing *Studer v. State*, 799 S.W.2d 263, 272-73 (Tex. Crim. App. 1990)).

In terms of federal law, Petitioner can be understood to claim that the lack of allegations of party liability deprived him of sufficient notice of the charges against him in violation of the Sixth Amendment. *See id.* at 69. "The Sixth Amendment requires only that a 'reasonable construction of the indictment would charge the offense for which the defendant has been convicted.'" *Fratta v. Davis*, 2017 WL 4169235, at *36 (S.D. Tex. Sept. 18, 2017) (quoting *McKay*, 12 F.3d at 69). Apart from any jurisdictional issues, "[t]he Fifth Circuit has observed that a state charging instrument is fatally defective only when 'under no circumstances could a valid conviction result from facts provable under the indictment[.]'" *Id.* (quoting *Liner v. Phelps*, 731 F.2d 1201, 1203 (5th Cir. 1984)). This determination depends on the law of the state where the indictment was issued. *Johnson v. Estelle*, 704 F.2d 232, 236 (5th Cir. 1983).

Texas law provides that party liability is not required to be set out in the indictment. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). Where the evidence supports a charge on the law of parties, which allows criminal responsibility for the acts of another, a defendant may be charged on the law of parties even though there was no such allegation in the charging instrument. *Johnson v. State*, 1996 WL 671240, at *3 (Tex. App.—Houston [14th Dist.] Nov. 21, 1996, no pet.) (citing *Crank v. State*, 761 S.W.2d 328, 352 (Tex. Crim. App. 1988), *cert. denied*, 493 U.S. 874 (1989)). The evidence at Petitioner's trial, which implicated Petitioner as one of several intruders at the Viacobo Residence, supported a charge on the law of parties.[5]

For these reasons, the undersigned Magistrate Judge concludes that this subclaim based on the illegality of the indictment is non-cognizable and otherwise without merit.

---

[5] "A person is criminally responsible for an offense committed by another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense." TEX. PENAL CODE. § 7.02(a)(2).

2.  Arraignment in the grand jury's presence

Petitioner's claim that his arraignment was conducted in front of the grand jury lacks merit. According to the record, Petitioner's indictment was merely read to the petit jury immediately prior to his trial. (*See* Dkt. No. 9-23 at 10-11). The reading of a defendant's indictment prior to their trial is required by Texas law. *See* TEX. CODE CRIM. PROC. art. 36.01 § (a); *Resendez v. Dretke*, 2004 WL 6082164, at *7 (S.D. Tex. Sept. 2, 2004). Because "nothing in the record shows that [Petitioner] was formally arraigned in the presence of the grand jury, he is not entitled to habeas relief on this ground." *See Resendez*, 2004 WL 6082164, at *7.

Indeed, this subclaim, along with Petitioner's claim of prosecutorial misconduct, appears to be based on a fundamental misunderstanding of the timeline of events in these proceedings. As discussed, Petitioner's arrest warrant was issued on January 30, 2002 and executed on September 5, 2003. (Dkt. No. 9-19 at 31-32). Petitioner's initial appearance occurred three days later on September 8, 2003. (*Id.*). On October 29, 2003, Petitioner was charged by indictment with one count of capital murder and one count of attempted capital murder (*id.* at 8-9), and the state court's criminal docket shows that he was formally arraigned on November 7, 2003 (*id.* at 21). The undersigned recognizes that the trial transcript labels the relevant proceedings as an "[a]rraignment" (*see* Dkt. No. 9-23 at 3) and that this labelling could have prompted Petitioner to make this subclaim. Irrespective of any labelling and as discussed above, the record does not support a claim that Petitioner was formally arraigned in the grand jury's presence.

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's subclaim that he was arraigned before the grand jury is without merit.

## B. Prosecutorial Misconduct

Petitioner's next claim is based on allegations of prosecutorial misconduct associated with his arrest and pre-trial detention. (Dkt. No 1 at 7). According to Petitioner, "the state prosecutor knowingly held [him] incarcerated for 326 days with no bond on an arrest warrant that was not for the [c]apital murder as alleged by the state prosecutor." (*Id.* at 10). Petitioner alleges that he "was arrested for possession of a firearm and D.W.I. on a traffic stop" but, "once in the county jail[,] . . . was arrested on [a] [c]apital murder warrant. . . ."[6] (*Id.* at 56-57). This claim can be understood to be grounded in the Fourth and Fourteenth Amendments insofar as it implicates the illegality of the arrest warrant.[7] *See Rose v. Mitchell*, 443 U.S. 545, 576 (1979) (Stewart, J., concurring) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)) ("Unconstitutional arrests are unreasonable seizures of the person that violate the Fourth and Fourteenth Amendments.").

To the extent Petitioner challenges his conviction on grounds of an illegal arrest warrant, such a claim is not supported by applicable law. "An illegal arrest, without more, is neither a bar to subsequent prosecution, nor a defense to a valid conviction." *United States v. Pineda-Chinchilla*, 712 F.2d 942, 943 (5th Cir. 1983) (per curiam) (citing *United States v. Crews*, 445

---

[6] In addition to capital murder and attempted capital murder, Petitioner did receive separate D.W.I. and firearm-related convictions, which presumably resulted from the September 5, 2003 traffic stop. Petitioner appears at certain times in his pleadings to challenge aspects of these D.W.I. and firearm convictions, which were adjudicated by the Hidalgo County Courts-at-Law. REGISTER OF ACTIONS, CASE NO. CR-209017-D, https://pa.co.hidalgo.tx.us/CaseDetail.aspx?CaseID=1393561 (last visited June 11, 2021); REGISTER OF ACTIONS, CASE NO. CR-217840-A, https://pa.co.hidalgo.tx.us/CaseDetail.aspx?CaseID=1055529 (last visited June 11, 2021). To the extent Petitioner wishes to advance claims regarding these offenses, he must do so in a separate petition. As the Advisory Committee Notes to Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts make clear, "[a] claim against a judgment of a court of a different political subdivision must be raised by means of a separate petition." Moreover, Petitioner did not challenge any aspect of his D.W.I. and firearm offense convictions on direct appeal or state collateral review, rendering such claims unexhausted. *See Sones v. Hargett*, 61 F.3d 410, 414-15 (5th Cir. 1996). Additionally, as Petitioner received time served for both of these convictions, he is no longer in custody pursuant to them. *See Maleng v. Cook*, 490 U.S. 488, 492 (1989) (per curiam).

[7] Insofar as Petitioner's claim rests on an application of the Speedy Trial Clause of the Sixth Amendment, such claim is addressed below.

U.S. 463, 474 (1980)); *see also Coker v. Thaler*, 670 F. Supp. 2d 541, 549-50 (N.D. Tex. 2009). Petitioner cannot argue he is suppressible "fruit" of an illegal arrest warrant, and even if his detention was illegal, this would not have deprived the state of the opportunity to prove his guilt through evidence wholly untainted by the alleged police misconduct.[8] *Crews*, 445 U.S. at 474.

Petitioner's claim also lacks factual support. To the extent Petitioner alleges that his arrest warrant was for possession of a firearm and D.W.I., such a claim is expressly belied by the record. At trial, Investigator Arredondo testified that he arrested Petitioner pursuant to "an active warrant" for "[c]apital murder." (Dkt. No. 9-27 at 43). Furthermore, Petitioner offers no reason to believe that his arrest warrant lacked probable cause or was otherwise illegal.

For these reasons, the undersigned Magistrate Judge concludes that this claim of prosecutorial misconduct is without merit.[9]

## C. Double Jeopardy

Petitioner claims his convictions constituted double jeopardy. (*See* Dkt. No. 1 at 7, 68-69).

---

[8] Respondent, citing *Stone v. Powell*, 428 U.S. 465 (1976), argues that Petitioner's Fourth Amendment claim is barred on federal habeas review. (Dkt. No 8 at 14). Because Petitioner had the opportunity to challenge his arrest warrant at trial and did not do so, Respondent argues, Petitioner is not entitled to habeas relief on the ground that his allegedly illegal arrest produced evidence that was introduced at trial. (*Id.*). Although Respondent offers an accurate reading of *Powell*, Petitioner does not expressly or impliedly argue that his arrest produced any evidence that was used to convict him. Instead, he presents a freestanding challenge to his arrest warrant based on alleged defects.

[9] Petitioner also seems to allege that the prosecutor used "perjured testimony" to obtain the indictment. (Dkt. No. 1 at 9). Petitioner appears to claim that the state prosecutor incorrectly stated that he was arrested for capital murder and attempted capital murder, but that he was, in fact, arrested for D.W.I and firearm possession. This claim is expressly belied by the record, as Petitioner's arrest warrant, which was issued on January 30, 2002, more than a year before his arrest, was clearly for capital murder. (*See* Dkt. No. 9-19 at 31-32). Petitioner also claims that the state prosecutor used additional perjured testimony consisting of "signed confession[s] of four co-defendants whom all waived jury trial" to support his conviction and indictment. (Dkt. No. 1 at 9). Petitioner's claim that such statements were used to support his conviction is also not supported by the record, as none were introduced at his trial. (*See* Dkt. No. 9-50). Additionally, such statements could be used to indict Petitioner as hearsay or confrontation concerns are not applicable to grand jury proceedings, *see United States v. Ortiz*, 687 F.3d 660, 664 (5th Cir. 2012), and Petitioner offers nothing to show that the statements were perjured beyond conclusory remarks.

The Fifth Amendment provides in relevant part that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. CONST. amend. V. This provision, known as the Double Jeopardy Clause, applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794 (1969). The Fifth Amendment's guarantee against double jeopardy prohibits three separate constitutional violations: (1) the prosecution for the same offense after acquittal, (2) the prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *United States v. Paternostro*, 966 F.2d 907, 910 (5th Cir. 1992). "The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

First, Petitioner asserts that he was subject to double jeopardy insofar as he was acquitted of capital murder and attempted capital murder but was subsequently prosecuted for and convicted of both offenses. (*See* Dkt. No. 1 at 12, 49, 56, 68, 82-83). This claim is not supported by the record. Petitioner does not point to, and the undersigned is unaware of, any portion of the record establishing that Petitioner was acquitted of the charges prior to trial. The undersigned understands Petitioner to claim that his trial counsel's motion to quash the indictment, which was heard immediately prior to trial, resulted in his acquittal. (*See* Dkt. No. 9-23 at 9-10). However, as the record makes clear, this motion was denied. (*See id.*). Petitioner offers no reason to believe that the state trial court's denial of the motion to quash the indictment "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Petitioner also invokes the double jeopardy protection against multiple punishments. (*See* Dkt. No. 1 at 68, 82-83). In determining whether two statutory provisions constitute the same offense for double jeopardy purposes, courts apply the test adopted in *Blockburger v. United States*, 284 U.S. 299 (1932). The *Blockburger* test requires an examination of whether each provision requires proof of a fact which the other does not. *Id.* at 304. If each applicable statutory provision does, in fact, require proof of a fact which the other does not, then the *Blockburger* test is satisfied, "notwithstanding a substantial overlap in the proof offered to establish the crimes." *United States v. Tovar*, 719 F.3d 376, 383 (5th Cir. 2013) (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)) (quotations omitted).

That said, "[t]he Supreme Court has also sanctioned examining whether the legislature intended to provide for multiple punishments." *Lechner v. Litscher*, 213 F. Supp. 2d 975, 988 (E.D. Wis. 2002) (collecting cases). In *Missouri v. Hunter*, 459 U.S. 359 (1983), a defendant's conviction and sentence for armed criminal action and first-degree robbery was deemed not to violate double jeopardy because, even though the state court below determined the two offenses proscribed the same conduct, the state court also recognized that the legislature intended for punishment on the violations to be cumulative. *Id.* at 360-62, 368-69. According to the *Hunter* court, "[t]he *Blockburger* test is a rule of statutory construction, and because it serves as a meaning of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." *Id.* at 367 (quoting *Albernaz v. United States*, 450 U.S. 333, 340 (1981)) (internal quotations and emphasis omitted). When examining a state legislature's intent, federal courts "must accept the [state court's] construction of [its] statutes, and so [they] look to that court's decisions as to whether the legislature intended cumulative

punishments" for two separate statutory provisions that may otherwise constitute the same offense. *See Reeves v. Stoddard*, 798 F. App'x 865, 868 (6th Cir. 2020) (citing *Hunter*, 459 U.S. at 368).

Here, Petitioner was charged and convicted of capital murder and attempted capital murder in violation of Texas Penal Code §§ 19.03(a)(2) and 19.03(a)(7)(A), respectively. *See Cantu*, 2006 WL 3953398, at *9. Although the TCCA does not appear to have expressly addressed whether the Texas legislature intended for these provisions to constitute the same offense, the Appeals Court did so in the context of Petitioner's direct appeal. *See id.* at *9-11. The Appeals Court began with a *Blockburger*-type analysis, determining that the provisions each required proof of a different fact to support a conviction. *See id.* at *9-10. Section 19.03(a)(2) provides that a person commits capital murder if they commit murder and "the person intentionally commits the murder in the course of committing or attempting to commit . . . burglary[.]" TEX. PENAL CODE § 19.03(a)(2). Section 19.03(a)(7)(A) provides that a person commits capital murder if they commit murder and "the person murders more than one person . . . during the same criminal transaction[.]" *Id.* § 19.03(a)(7)(A). As the Appeals Court concluded, each provision requires proof of a fact that the other does not: the former a separate enumerated criminal act such as burglary and the latter the murder (or, in this case, attempted murder) of multiple persons.[10] *Cantu*, 2006 WL 3953398, at *10. The Appeals Court then noted that the applicable "statute separates the sections by 'or,' which is some indication that any one of the prohibited types of conduct constitutes a separate offense." *Id.* at *10. With that, the Appeals Court concluded "that the legislature intended that each separately described conduct constitutes a separate statutory offense." *Id.*

Although the Appeals Court did not expressly cite *Blockburger* or *Hunter*, its analysis appears consistent with these precedents, and a federal habeas court is only authorized by the

---

[10] As the indictment makes clear, the "multiple persons" in this case were Carlos Viacobo, Jaime Viacobo, and Julio Viacobo. (Dkt. No 9-19 at 9).

federal habeas statute to review a state court's "decision," not its written opinion. *Cobb v. Thaler*, 682 F.3d 364, 378 n.8 (5th Cir. 2012); *see also Long v. Roberts*, 2007 WL 2875111, at *8 (D. Kan. Oct. 3, 2007) (holding that although state court did not cite *Blockburger*, its analysis was nevertheless "consistent with federal case law"). Indeed, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Because the Appeals Court's decision reasonably reflects the Supreme Court's double jeopardy jurisprudence, it is neither "contrary to" nor an "unreasonable application of" federal law. *See* 28 U.S.C. § 2254(d)(1); *see also Garfias v. Davis*, 2018 WL 1457249, at *9 (N.D. Tex. Mar. 23, 2018).

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's double jeopardy claim is without merit.

## D.  Unconstitutional Identification Procedure

Next, Petitioner claims that his identification as an intruder by Jaime Viacobo and Martinez was unconstitutional because they were each informed that an arrest warrant for Petitioner had been issued prior to identifying him through the photo array. (Dkt. No. 1 at 7, 11).

"[A] conviction based on an eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The admissibility of such identification evidence is governed by a two-step test. *Id.* First, a court must determine whether the identification procedure was impermissibly suggestive. *Id.* If so, the court must then determine whether, under the totality of the circumstances, the

identification was nonetheless reliable. *Bloodworth v. Hopper*, 539 F.2d 1382, 1384 (5th Cir. 1976) (per curiam) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).   Independent indicia of reliability include the following: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Neil*, 409 U.S. at 199-200.   "An identification infected by improper police influence . . . is not automatically excluded[,]" and "if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).

The first inquiry, then, is whether the identification procedure was impermissibly suggestive.   Such is the case where an identification procedure steered the witness to one suspect or another, independent of the witness's honest recollection. *Howard v. Warden, Lebanon Corr. Inst.*, 2012 WL 395186, at *5 (S.D. Ohio Feb. 7, 2012) (quoting *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009)) (quotations omitted).   In making this determination, courts are permitted to consider the photo array's size, how it was presented to witnesses, and the photos themselves. *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (citing *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)); *see also Manson v. Brathwaite*, 432 U.S. 98, 107-09 (1977) (identification procedure impermissibly suggestive where witness presented with only one photo); *Passman v. Blackburn*, 652 F.2d 559, 570 (5th Cir. 1981) (photo array impermissibly suggestive where it consisted of "a single color photograph [of petitioner], front view, with eleven other black and white mug shots, front and side views").

Jaime and Martinez each testified that no one suggested who the police suspected of the crime prior to the identification. (Dkt. No. 9-26 at 44; Dkt. No. 9-27 at 34). Officer Silva testified that Jaime and Martinez were informed that "warrants had been issued" for suspects (Dkt. No. 9-26 at 35-36), [11] which would not of itself appear to steer to one suspect or another. As for the characteristics of the photo array, Martinez testified that the array consisted of five pages of photos, each page containing six to eight different images. (Dkt. No. 9-27 at 33). A review of the page in which Petitioner's photo appears (Dkt. No. 9-20 at 220, 225) does not reveal that the photo was "highlighted in any way." *See United States v. Hamilton*, 420 F.2d 1292, 1295 (D.C. Cir. 1969).

Even if it was suggestive to advise Jaime and Martinez of the issuance of warrants, the record supports a finding of substantial indicia of reliability in the identifications. Jaime testified that he would have recognized Petitioner as one of the intruders regardless of whether he saw Petitioner's photo in the array. (Dkt. No. 9-26 at 45). Petitioner stood out to Jaime on the night in question because of his distinctive size, complexion, and clothing. (*Id.*). Jaime testified to having no doubt in his identification. (*Id.*). Martinez testified that there was nothing distinctive about Petitioner's photo to suggest that he was a suspect. (Dkt. No. 9-27 at 34). Like Jaime, Martinez stated that she would have recognized Petitioner even if she had not participated in the identification procedure. (*Id.*). Martinez first saw Petitioner through a window while Petitioner was standing in the driveway of the Viacobo Residence. (*Id.* at 28). Petitioner was illuminated by light from a nearby light pole. (*Id.*). Martinez testified that she had "no doubt . . . whatsoever"

---

[11] On cross-examination, Officer Silva responded affirmatively to a question regarding whether his testimony was "that both Jaime Viacobo and Mariana Martinez were aware that there was a warrant out issued for [Petitioner]" when they made their identifications of him. (Dkt. No. 9-26 at 36). To the extent this testimony is inconsistent with his prior testimony or the testimony offered by Jaime and Martinez, the "jury [was] free to choose among reasonable constructions of the evidence. *See West v. Howell*, 1995 WL 29338, at *5 (5th Cir. Jan. 18, 1995) (per curiam) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982)).

that Petitioner was the man she saw at her house on January 25, 2002.  (*Id.* at 34).  Moreover, Jaime and Martinez each identified Petitioner on February 13, 2002, or 19 days after allegedly viewing him at the crime scene.  (*See* Dkt. No. 9-20 at 220, 225).  Courts have held that identifications occurring one month between the crime and confrontation are consistent with a finding of reliability. *See, e.g., Richardson v. Dretke*, 2006 WL 740217, at *5 (N.D. Tex. Jan. 23, 2006), *report and recommendation adopted*, 3-05-CV-1225-B (N.D. Tex. Mar. 10, 2006).

Accordingly, both Jaime and Martinez each demonstrated an opportunity to view Petitioner at the crime scene, a certain degree of attention to Petitioner during the incident, and significant certainty in their identification of Petitioner at confrontation, such identifications being relatively close in time to the crime.  The Fifth Circuit has found identifications to be reliable when these four indicia of reliability were met. *See, e.g., United States v. Moody*, 564 F.3d 754, 762-63 (5th Cir. 2009).  The identifications of Petitioner in the photo array appear, therefore, to be reliable.

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's claim based on the alleged unconstitutionality of the identification procedure is without merit.

## E.  Unconstitutional Delay

Petitioner complains of pre-trial delay based on the allegation that he "spent 326 days in the Hidalgo County jail . . . pending jury trial for [c]apital murder."[12] (Dkt. No. 1 at 8, 12).

The Speedy Trial Clause of the Sixth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]"  U.S. CONST. amend. VI; *Klopfer v. North Carolina*, 386 U.S. 213 (1967).  In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court identified four factors to be examined when assessing a claim under the Speedy Trial Clause:

---

[12] The 326-day period alleged appears on Petitioner's sentencing documents (Dkt. No. 9-20 at 321), but the duration between arrest (September 5, 2003) and the first day of trial (July 13, 2004) was in fact 312 days.

(1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted their right to a speedy trial, and (4) any prejudice to the defendant. *Id.* at 530. However, "[t]he bare minimum required to trigger a *Barker* analysis is one year." *Amos v. Thornton*, 646 F.3d 199, 206 (5th Cir. 2011) (per curiam). Where the period of pre-trial delay is less than one year, then the petitioner must show extreme prejudice or willfulness by the prosecution to delay the trial in order to hamper the defense. *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994). Here, Petitioner's period of pretrial incarceration falls short of the one-year threshold, and Petitioner otherwise fails to show extreme prejudice or willfulness on the part of the state prosecutor to delay his trial.

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's Speedy Trial Clause claim is without merit.

## F. Ineffective Assistance of Trial Counsel

Petitioner argues that he received ineffective assistance of counsel at trial. (Dkt. No. 1 at 13). Specifically, Petitioner identifies several instances of alleged ineffective assistance which are reclassified as follows: (1) the failure "to object to the charge to the jury, the arrest warrant, and the arraignment of [P]etitioner in the presence of the grand jury," (2) the failure to plead double jeopardy, and (3) the failure to file a notice of appeal as to all counts of conviction. (*Id.*). The undersigned takes each of these subclaims of ineffective assistance in turn.

### 1. Failure to object

"[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness[.]" *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). As discussed above, Petitioner's challenges to the arrest warrant lack merit, and the assertion that Petitioner was arraigned in front of the jury is not supported by the record. Related objections would therefore have been frivolous.

As to the matter of the jury charge, Petitioner argues that "the state must inform the jury that it is not seeking a death sentence [a]nd if so a [l]ife sentence is automatic upon conviction." (Dkt. No. 1 at 67). According to Petitioner, counsel's failure to object to the lack of this jury instruction amounted to ineffective assistance. (*Id.*). Under Texas law, however, "[a]n instruction regarding punishment is not proper in the guilt-innocence stage of trial." *Murkledove v. State*, 437 S.W.3d 17, 23 (Tex. App.—Fort Worth 2014, pet. ref'd) (citing *Staggs v. State*, 503 S.W.2d 587, 588 (Tex. Crim. App. 1974)); *see also* TEX. CODE CRIM. PROC. art 37.07, § (2)(a) (providing that trial court will instruct jury on guilt or innocence "without authorizing the jury to pass upon the punishment to be imposed"). Accordingly, any objection against the jury charge would have been frivolous and otherwise fail to amount to deficient performance. *See Green*, 160 F.3d at 1037.

For these reasons, the undersigned Magistrate Judge concludes that this subclaim of ineffective assistance at trial is without merit.

### 2. Failure to plead double jeopardy

Petitioner argues that trial counsel's failure to "plead double jeopardy" constituted ineffective assistance. (Dkt. No. 1 at 13). However, the undersigned agrees with the Appeals Court's assessment of this issue, such that any double jeopardy claim would not have been successful.[13] Defense counsel's failure to raise such a claim at trial cannot constitute deficient performance. *See Green*, 160 F.3d at 1037. For these reasons, the undersigned Magistrate Judge concludes that this subclaim of ineffective assistance at trial is without merit.

---

[13] The undersigned also notes that Petitioner's alternative double jeopardy claim (i.e., that he was convicted of capital murder and attempted capital murder following acquittal on these charges), which the Appeals Court did not address, is meritless for the reasons discussed above.

3. Failure to file a notice of appeal

Petitioner complains that trial counsel filed a notice of appeal as to only count one. (Dkt. No. 1 at 13). This claim, however, is not supported by the record, and Petitioner is thus unable to demonstrate deficient performance. Both counts of the indictment fell under the same cause number and were expressly identified in the notice of appeal. (Dkt. No. 9-20 at 328-29). Moreover, both counts were addressed on appeal, for example, as part of Petitioner's double jeopardy challenge. *Cantu*, 2006 WL 3953398, at *9-10. For these reasons, the undersigned Magistrate Judge concludes that this subclaim of ineffective assistance at trial is without merit.

## G. Ineffective Assistance of Appellate Counsel

Petitioner next argues that he received ineffective assistance on appeal, citing to counsel's filing of several motions requesting additional time to file an appellate brief and the failure to raise a claim of ineffective assistance of trial counsel. (Dkt. No. 1 at 14).

However, Petitioner offers no reason to believe that appellate counsel's motions for additional time to file an appellate brief constituted deficient performance. Petitioner also does not establish prejudice insofar as his appeal was ultimately heard by the Appeals Court, contradicting Petitioner's claim that counsel's motions somehow caused "the original mandate" to expire. (*Id.* at 60). Moreover, as discussed above, Petitioner's claims of ineffective assistance of trial counsel lack merit, so the failure to raise any such issues on appeal did not constitute deficient performance. *See Green*, 160 F.3d at 1037. The "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)) (internal quotations omitted). Regardless, Texas courts have held that "[i]n the majority of instances, the record on direct appeal is simply

undeveloped and cannot adequately reflect the failings of trial counsel." *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's claim for ineffective assistance of appellate counsel is without merit.

## H. Insufficient Evidence to Support Conviction

Petitioner's next claim is that his "conviction was obtained as the result of evidence that is insufficient to persuade a properly instructed reasonable jury of his guilt beyond a reasonable doubt." (Dkt. No. 1 at 15). Petitioner can be understood to claim that Jaime Viacobo and Martinez's eyewitness testimony, including in particular their identifications using the photo array, along with Villarreal's testimony, were insufficient for a jury to convict him considering the lack of any direct physical evidence linking Petitioner to the crime scene.

In reviewing the sufficiency of evidence, "[a] conviction will be affirmed if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotations omitted and emphasis in original). Where "a state appellate court thoughtfully reviews the issue of sufficiency of the evidence, that court's determination is entitled to 'great weight.'" *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) (per curiam) (quoting *Jackson*, 443 U.S. at 322 n.15).

Here, the Appeals Court determined that the trial evidence was sufficient, noting that—

> [t]he evidence supporting the verdict include[d] the eyewitness testimony of Jaime and [Martinez] identifying [Petitioner] as one of the assailants. It also include[d] the accomplice testimony of [Villarreal] that four of the five men (not including [Petitioner]) were armed, that [Petitioner] went to the Viacobo [R]esidence, entered the residence, and knew about the robbery before they headed to Donna to carry it out.

*Cantu*, 2006 WL 3953398, at *8.  Moreover, the testimony offered at trial was not that Petitioner was merely at the Viacobo Residence on the night in question, but that he was actively engaged in the events of that night.  Both Jaime Viacobo and Martinez testified to observing Petitioner holding a rifle at different times and in different locations.  (Dkt. No. 9-26 at 40; Dkt. No. 9-27 at 40). Furthermore, Martinez testified that she saw three of the intruders, including Petitioner, briefly meet at the pickup truck before splitting off in different directions: Petitioner toward a nearby carport and the other two men toward the patio, which coordinated activity lends support for a finding that the participants were acting pursuant to a common plan or goal.  The undersigned, cognizant of the deference owed to the Appeals Court's sufficiency finding, agrees that the evidence presented at trial was sufficient for a jury to find Petitioner guilty of capital murder and attempted capital murder beyond a reasonable doubt.  Eyewitness testimony is sufficient to support a conviction in Texas in the absence of direct physical evidence linking a defendant to a crime. *See, e.g., Jackson v. State*, 530 S.W.3d 738, 742 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The testimony of a single eyewitness can be enough to support a conviction.").

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's claim of insufficient evidence is without merit.

## I.  Denial of Access to Trial Record

Petitioner's ninth claim is that he, "an [i]ndigent, was denied access to a free transcript of [his] trial record for the appeal." (Dkt. No. 1 at 16).

"[I]f the habeas petitioner's attorney was provided a copy of his trial transcript for his direct appeal, there is no requirement that the defendant be provided with physical custody of a copy of his transcript." *Richardson v. Quarterman*, 2008 WL 5056724, at *6 (S.D. Tex. Nov. 20, 2008) (quoting *Smith v. Beto*, 472 F.2d 164, 165 (5th Cir. 1972)).  Petitioner's appellate counsel had

access to the trial transcript as evidenced by the fact that she referenced it before the Appeals Court. (*See* Dkt. No. 9-7 at 8-12); *see also Ballard v. Collins*, 1994 WL 121936, at *1 (5th Cir. Mar. 25, 1994) (per curiam) (finding petitioner had access to trial record where appellate brief contained references to trial record). Indeed, Petitioner admits that "[a]ppeals courts have concluded that a defendant has no right to a free copy [of his or her trial transcript] for [h]abeas [c]orpus [review] and that [a] direct appeals attorney['']s review of the record for direct review is sufficient. . . ." (Dkt. No. 1 at 16). Petitioner contends this rule is inappropriate because he raises the ineffective assistance of appellate counsel. (*Id.*) Regardless, Petitioner does not cite, and the undersigned is unable to locate, any binding case law establishing his desired exception.[14]

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's claim for denial of access to his trial record is non-cognizable and otherwise without merit.

## J. Correct Sentence

Finally, through his response to the Summary Judgment Motion, Petitioner arguably makes what the undersigned construes as a "correct sentence" claim, requesting that the District Court enter a nunc pro tunc correction of his sentence from terms of life imprisonment and 99-years' imprisonment to a 35-year term. (*See* Dkt. No. 10 at 2-3).

By way of background, on October 31, 2019, Petitioner filed a pleading entitled "Motion for Nunc Pro Tunc to Vacate Capital Life, and 99 Years Federal Jurisdictional [sic]," which was docketed in a separate case, *Cantu v. Davis*, Case No. 7:19-MC-2156. Through that motion,

---

[14] An unpublished opinion, specifically, *Yates v. Collins*, 1993 WL 82111 (5th Cir. Mar. 16, 1993) (per curiam), discusses this issue. In *Yates*, a habeas petitioner argued that he was entitled to personal custody of his trial record because he had raised an ineffective assistance of appellate counsel claim. *Id.* at *1. The Fifth Circuit concluded that the petitioner was not entitled to personal custody of his trial record because his ineffective assistance claim lacked merit. *Id.* at *2. In so doing, the Fifth Circuit did not squarely address whether a petitioner with a meritorious ineffective assistance of appellate counsel claim would, as a rule, have a right to personal custody of their trial record. *See id.* Nonetheless, as discussed above, Petitioner's ineffective assistance claim is, like the petitioner's claim in *Yates*, meritless.

Petitioner asked for the correction of his sentence or authorization to file a successive § 2254 petition. In a Report and Recommendation dated April 10, 2020, the undersigned recommended that the District Court deny Petitioner's claim and open Petitioner's initial § 2254 petition, which happened to lay dormant at such time. The undersigned also noted that Petitioner could seek to amend his initial § 2254 petition to include previously unasserted claims. The District Court adopted that Report through an order dated June 22, 2020. In his response to the Summary Judgment Motion, Petitioner refers to his prior request that the District Court correct his sentence, which reference could arguably be interpreted as Petitioner's attempt to again raise such claim here.

To be clear, Petitioner did not raise this claim in the Petition itself, and it need not be considered. Where a petitioner raises new grounds in a document filed after their initial motion for collateral relief, the document should be construed as a motion for leave to amend the pleadings to add the new grounds under Rule 15 of the Federal Rules of Civil Procedure. *See Hale v. Young*, 584 F. App'x 246, 247 (5th Cir. 2014) (per curiam); *see also Philip v. United States*, 2016 WL 3626320, at *1 (N.D. Tex. June 14, 2016). "However, a district court may deny a motion to amend [a motion for collateral relief] when the amendment would be futile, even when the amendment would normally be allowed as a matter of course [under Rule 15(a)(1)]." *United States v. Banda*, 2014 WL 12609326, at *1 (S.D. Tex. Sept. 19, 2014) (citing *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009) (per curiam)).

Here, even if Petitioner's correct sentence claim could surmount any procedural barriers related to exhaustion and limitations, the claim is non-cognizable and otherwise meritless. As stated in the Report of April 10, 2020, Petitioner offers no legal authority to show that the District Court has jurisdiction to correct his state court sentence, nor has the undersigned been able to

identify any such authority. Normally, as a matter of Texas state law, it is the trial court that issues a judgment nunc pro tunc to correct a clerical error made in a judgment. *See State v. Bates*, 889 S.W.2d 306, 309 (Tex. Crim. App. 1994). The record clearly shows, however, that Petitioner was sentenced to life imprisonment for capital murder and 99 years for attempted capital murder.[15] (Dkt. No. 9-20 at 318-23).

For these reasons, the undersigned Magistrate Judge concludes that Petitioner's correct sentence claim is non-cognizable and otherwise without merit, and any motion for leave to amend the pleadings to add the claim should, therefore, be denied as futile.

## V. CONCLUSION

After review of the record and relevant law, the Magistrate Judge respectfully RECOMMENDS that the Summary Judgment Motion (Dkt. No. 8) be GRANTED, that the Petition (Dkt. No. 1) be DENIED, and that this civil action be DISMISSED.

### *Certificate of Appealability*

The Magistrate Judge must also address the matter of the issuance of a certificate of appealability ("COA").

A petitioner may not appeal the final order of a habeas corpus proceeding "unless a circuit justice or judge issues a [COA]." 28 U.S.C. § 2253(c)(1). Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that the District Court "must issue or deny a [COA] when it enters a final order adverse to the applicant." A petitioner is entitled to a COA when he shows that a reasonable jurist would find it debatable "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); 28 U.S.C. § 2253(c).

---

[15] Petitioner's claim appears to be based wholly on an erroneous statement made by the State in its response to Petitioner's second state application for habeas corpus. (*See* Dkt. No. 9-50 at 103).

Having concluded that Petitioner fails to meet this threshold, the Magistrate Judge RECOMMENDS that the District Court deny a COA.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

### *Directive to Clerk of Court*

The Clerk of Court is DIRECTED to forward a copy of this report to the parties by any receipted means.

DONE at McAllen, Texas this 6th day of July 2021.

J. SCOTT HACKER
United States Magistrate Judge